RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0357p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

> Nos. 24-5135/5526

COURTLAND REED (24-5135); CEDRIC SWANAGAN (24-5526),

*Defendants-Appellants*.

———————————

Appeal from the United States District Court for the Western District of Kentucky at Owensboro.
No. 4:22-cr-00003—Rebecca Grady Jennings, District Judge.

Argued:  October 23, 2025

Decided and Filed:  December 23, 2025

Before:  SUTTON, Chief Judge; CLAY and GIBBONS, Circuit Judges.

———————————

## COUNSEL

**ARGUED:**  Travis A. Rossman, ROSSMAN LAW, PLLC, Barbourville, Kentucky, for Courtland Reed.  Lori Beth Riga, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cleveland, Ohio, for Cedric Swanagan.  Madison T. Sewell, UNITED STATES ATTORNEY'S OFFICE, Louisville, Kentucky, for Appellee.  **ON BRIEF:**  Travis A. Rossman, ROSSMAN LAW, PLLC, Barbourville, Kentucky, for Courtland Reed.  Lori Beth Riga, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cleveland, Ohio, for Cedric Swanagan.  Madison T. Sewell, UNITED STATES ATTORNEY'S OFFICE, Louisville, Kentucky, for Appellee.

—————————————

## OPINION

—————————————

CLAY, Circuit Judge.   Defendants Cedric Swanagan and Courtland Reed appeal from their convictions and sentences for possession with intent to distribute 50 grams or more of methamphetamine and conspiracy to possess with intent to distribute 50 grams or more of methamphetamine, under 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii), and 846 and 18 U.S.C. § 2. For the reasons set forth below, we **AFFIRM** Defendants' convictions, **AFFIRM** Swanagan's sentence, **VACATE** Reed's sentence, and **REMAND** to the district court to resentence Reed.

## I.  BACKGROUND

In September 2021, the Drug Enforcement Administration ("DEA") and Owensboro Police Department ("OPD") began collaborating on an investigation into a suspected drug trafficking organization.   Through those efforts, investigators learned of Defendant Cedric Swanagan.   In February 2022, investigators obtained a warrant for a wiretap of Swanagan's phone based on an affidavit by DEA Task Force Officer James Budde.   The affidavit relied on intercepted conversations between Swanagan and an individual named Marla Huff, whom police had arrested on drug trafficking charges.   It also relied on intercepted conversations between Swanagan and Birdie Phillips (formerly Lawless), an affiliate of Swanagan.   Budde interpreted those communications to indicate that Lawless intended to deliver drug proceeds to Swanagan for methamphetamine he had supplied to her.   In one such phone call, Lawless indicated that she would drop "SIX" in a mailbox as directed by Swanagan.   Budde Aff., R. 140-1, Page ID #454. Budde interpreted that call to mean that Lawless was delivering $6,000 in drug proceeds to Swanagan.

The affidavit also relied upon subpoenaed toll records for Swanagan's phone that revealed Swanagan frequently communicated with "a known controlled substance distributor" and corroboration from a confidential source that Swanagan was a source of supply for that distributor.   *Id.* at Page ID #456.   The same toll records reflected that Swanagan had frequently

communicated with another individual whose discussions about "distributing controlled substances" were previously intercepted. *Id.* at Page ID #457.

Pursuant to the warrant, investigators intercepted phone calls that they considered to be evidence of Swanagan's and others' involvement in drug trafficking. Those calls included conversations with Courtland Reed and one Nicholas Stallings, who investigators believe was a source of methamphetamine supply for Swanagan.

On February 22, 2022, Swanagan instructed Nicole Toliver to deliver three bags of methamphetamine from the apartment he provided for her at 513-1/2 St. Ann Street, Owensboro, Kentucky, to someone who would give her money. He also instructed her to give that person a ride. In a text message, Swanagan told Toliver that the person she was to meet would give her $2,900 and that she could keep $100 of it. When Toliver arrived at the address to which Swanagan had sent her, Reed emerged, handed her "a stack of money," and asked for a ride to a Super 8 motel. Jury Trial Tr. Vol. 2, R. 404, Page ID #2334. Toliver told Reed, "Whenever we get to the hotel, that's when I'll get the methamphetamine out to give to you . . . ." *Id.* at Page ID #2335.

While Toliver and Reed were on their way to the Super 8 motel, drug investigators overheard a phone call on the Swanagan wire indicating that Toliver had been pulled over by the police. Unaware of the Swanagan investigation, OPD Officer Timothy Kendall had spotted Toliver's PT Cruiser, ran the license plates, and noticed that Toliver had an outstanding warrant. Kendall conducted a stop, arrested Toliver, released Reed, and called for a K-9, which alerted on the vehicle. Police retrieved two large bags of methamphetamine from a pink duffle bag that had been in the backseat of the car. The pink bag also contained Toliver's driver's license. Toliver claimed the bag belonged to her. Officers also found approximately $2,800 in the vehicle. Toliver later consented to a search of the apartment at 513-1/2 St. Ann Street, and police found methamphetamine there.

A grand jury initially indicted Defendants for conspiracy to possess with intent to distribute methamphetamine and later for possession with intent to distribute methamphetamine.

Defendants pled not guilty to both charges. The district court ultimately consolidated Defendants' cases for trial.

In November 2022, Swanagan filed a motion to suppress "all testimonial and physical evidence obtained by law enforcement officials during the investigative phase" of the case. Mot. Suppress Evid. & Hr'g, R. 129, Page ID #307. He argued that Budde, in his wiretap affidavit, had recklessly or intentionally cited conversations that were "innocent in nature" and that did "not discuss any type of narcotic activity . . . ." *Id.* at Page ID #313. He specifically took issue with Budde's reference to Facebook conversations between Swanagan and Huff. Budde had interpreted the use of a water emoji in those messages to symbolize methamphetamine. Swanagan argued it represented sexual relations, offering internet dictionary definitions as support, and requested a hearing.

The district court denied the motion without a hearing. It found that Swanagan had "failed to produce a substantial preliminary showing that Officer Budde made false statements in the affidavits or deliberately or recklessly omitted information related to Swanagan from the affidavits" and "failed to make a showing that the alleged false statements [were] necessary to the finding of probable cause to secure a wiretap of Swanagan's cell phone." Mem. Op. Order, R. 152, Page ID #523–24.

At trial, the government called several law enforcement and civilian witnesses. DEA forensic chemists testified that the methamphetamine the police retrieved from Toliver's car on February 22, 2022, weighed 667.7 grams at 98% purity and that the methamphetamine the police retrieved in their search of the 513-1/2 St. Ann Street apartment weighed 222 grams at 100% purity.

Detective Cliff Simpson testified as a drug crime investigator opinion witness about the structure and operation of drug trafficking organizations and the meaning of certain code words that drug traffickers use to subvert government monitoring, such as "action" (methamphetamine). Jury Trial Tr. Vol. 3, R. 405, Page ID #2555. He testified that someone personally using methamphetamine might carry a gram or less, a street-level dealer might carry

3.5 to 14 grams, a mid-level dealer might carry a quarter pound (113 grams), and upper-level dealers might carry multiple pounds (hundreds of grams).

Detectives Kristen Dirickson and Benjamin Fleury testified about the investigation of Swanagan.  During their testimony, the government introduced audio recordings from the Swanagan wiretap.  The government laid a foundation that Dirickson was personally involved in the investigation, had monitored calls and messages from the wiretap, and had observed a call between Swanagan and Toliver during the February 22, 2022, traffic stop.  Upon introducing the first phone call in Dirickson's direct examination, the government asked, "[C]an you kind of summarize, based on your investigation, what [Defendants] were talking about there[?]"  *Id.* at Page ID #2435.  Dirickson responded without objection from Defendants.  Similar questioning proceeded regarding another two calls.  On the fourth call, Defense objected to the following exchange:

> Q.     And can you kind of summarize what you heard them saying about the car.
>
> A.     Cedric was trying to find somebody to go back and get the car before, basically, it was seized.

*Id.* at Page ID #2439.  Swanagan's counsel stated:

> I'm going to object to the testimony of the detective attempting to interpret or narrate what is on the recordings.  It's up to the jury to determine for themselves what they believe they're hearing in those recordings and to apply that interpretation to the facts of this case. . . . I would simply ask . . . [the government] to establish that those recordings were made, that they're accurate reflections of the recording, and allow the jury to interpret those recordings themselves.

*Id.*  The district court instructed the government to ask Dirickson questions probing "what she did based on what she heard" or "how it factored into her investigation" but not "ask[ing] her to translate it . . . ."  *Id.* at Page ID #2439, 41.  Swanagan's counsel agreed with that directive.

Swanagan's counsel objected again on the same ground when the government asked Dirickson about her "understanding" of another call and "why [it was] important to [her] investigation[.]"  *Id.* at Page ID #2443.  The district court permitted the question, distinguishing

it from asking what the calls said.  Later, Reed's counsel objected to Dirickson's interpretation of a recording, and Swanagan's counsel joined.  The district court resolved that Dirickson could testify to what the language on the call "mean[t] to her . . . ."  *Id.* at Page ID #2453.

The government similarly laid a foundation that Fleury had been involved in monitoring the Swanagan wiretap.  The government's questions regarding the recordings introduced through Fleury comported with the district court's guidance to emphasize the significance of the calls to Fleury and the investigation.  Those calls included numerous conversations between Swanagan and others such as Reed, Toliver, Stallings, and customers.  Fleury repeatedly testified that those calls helped law enforcement gain an understanding of ongoing transactions, the relationship between Swanagan and Reed, the internal operations of the drug trafficking organization, and quantities, prices, and the customer base for crystal methamphetamine.  He also interpreted certain slang terms such as "zips" (ounces) and "action" (crystal methamphetamine).  *Id.* at Page ID #2504, 2506.

Additional witnesses testified about their affiliations with Swanagan.  Among them, Lawless testified that beginning around October 2021 and for approximately five weeks she would obtain methamphetamine from Swanagan to redistribute to others.  Toliver testified that she would "middleman" in drug transactions for Swanagan and that Swanagan provided her the apartment at 513-1/2 St. Ann Street.  Jury Trial Tr. Vol. 2, R. 404, Page ID #2312.  She also testified about the events of February 22, 2022, specifically stating that the methamphetamine found in her car and apartment in the aftermath of the traffic stop belonged to Swanagan. Lawless and Toliver both had entered their own plea agreements in the case.

After the government rested, both Defendants moved for judgment of acquittal under Federal Rule of Criminal Procedure 29 on the grounds that the evidence was insufficient to establish possession or conspiracy.  The district court denied the motions.  After the close of evidence, Defendants renewed their motions for judgment of acquittal, which the district court denied.

Reed had been restrained with shackles in the courtroom during the trial.  The record does not contain evidence that the jury saw those shackles.  The district court had engaged with

Reed's counsel off the record to ensure that the tablecloth at the defense table hid the shackles. It appeared to the district court that counsel was satisfied that it did.

On the second morning of trial, marshals escorted Defendants, who were wearing shackles, through the courthouse lobby while jurors entered the same area. Upon learning that fact, the district court immediately separated the jurors who had potentially seen Defendants in the lobby from the rest of the jury, reviewed security camera footage, and sent a supervisor to ensure jurors were not discussing the incident. From the security tape, the district court determined that three jurors had entered the building during the two minutes in which Defendants moved through the entry way. Although Defendants asserted additional facts based on their own observations, they agreed with the court's suggestion to voir dire the three jurors to detect any actual prejudice resulting from the lobby encounter.

In the special voir dire, the district court asked each of the three jurors, one at a time, essentially what he had observed in the lobby that morning and whether it would affect his ability to decide the case based on the evidence and law. Counsel also had an opportunity to raise questions for the court to ask. The district court found that the voir dire did not reveal actual prejudice, inasmuch as all three jurors indicated that they would remain fair and impartial and that, regardless, they had not specifically noticed Defendants in the lobby. Defendants objected and read additional observations of their own into the record.

The jury convicted both Defendants on both counts. The Defendants stipulated to certain prior state-level convictions, including Trafficking in a Controlled Substance (Cocaine) in March 2009 for Swanagan and First Degree Burglary in January 2011 for Reed, and the jury's verdict accordingly accepted those convictions. Both Defendants timely filed renewed motions for judgment of acquittal and motions for new trials. The district court denied the motions.

The probation office determined that Reed's offense level was 34 and his criminal history category was V, resulting in an advisory range of 235 to 293 months of imprisonment under the U.S. Sentencing Guidelines ("U.S.S.G."). The statutory minimum was 25 years (300 months) because of a 21 U.S.C. §§ 841(b)(1)(A) and 851 enhancement predicated on two prior convictions, including the First Degree Burglary. Reed disputed that those prior convictions

qualified him for that enhancement. The district court rejected Reed's argument, applied the enhanced statutory minimum, and sentenced Reed to 300 months of imprisonment.

Swanagan's base offense level was 34, and he received a two-point enhancement for maintaining a premises for the purpose of manufacturing or distributing a controlled substance and a four-point enhancement for his role as an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive. The resulting offense level was 40. Swanagan's criminal history category was VI. The report classified Swanagan as a career offender (although that classification did not affect Swanagan's guidelines range). The resulting guidelines imprisonment range was 360 months to life. The statutory range under 21 U.S.C. §§ 841 and 851 was 15 years (180 months) to life.

Swanagan disputed, among other points, that he had been a "principal organizer or leader in any drug-related criminal enterprise" or was a career offender. Swanagan Sentencing Mem., R. 410, Page ID #2643. He broached the argument that his prior state drug conviction did not qualify as a predicate for career offender status or a § 851 enhancement. Finally, he asked that the district court vary downward from the guidelines range for pure methamphetamine to the range for methamphetamine mixture. The district court rejected Swanagan's arguments and sentenced him to a prison term of 360 months.

Reed and Swanagan timely appealed from the district court's judgments against them. *See* Fed. R. App. P. 4(b)(1)(A)(i). Both Defendants challenge the sufficiency of the evidence, the district court's failure to dismiss jurors who allegedly saw Defendants shackled in the courthouse lobby, and Dirickson's and Fleury's trial testimony.

Reed additionally argues that the district court erred by allowing him to be shackled during trial without a hearing and that his prior state-level conviction for First Degree Burglary should not have served as a predicate for the 21 U.S.C. §§ 841 and 851 sentence enhancement.

Swanagan additionally challenges the district court's denial of his pretrial motion to suppress evidence without a *Franks* hearing, his career offender classification and 21 U.S.C. §§ 841 and 851 enhancement, his leadership role enhancement, and the district court's refusal to vary his sentence range downward to the range for a methamphetamine mixture.

## II. DISCUSSION

### A. Swanagan's Motion to Suppress Evidence

Swanagan argues that the district court abused its discretion by denying his motion to suppress evidence without holding a *Franks* hearing. "Whether to hold an evidentiary hearing based upon a challenge to the validity of a search warrant's affidavit, given alleged misstatements and omissions, is committed to the sound discretion of the district court." *United States v. Young*, 847 F.3d 328, 348 (6th Cir. 2017). With respect to the district court's denial of a *Franks* hearing and motion to suppress evidence, we review factual findings for clear error and conclusions of law *de novo*. *United States v. Bateman*, 945 F.3d 997, 1007–08 (6th Cir. 2019) (quoting *United States v. Graham*, 275 F.3d 490, 505 (6th Cir. 2001)); *Young*, 847 F.3d at 348 (citing *United States v. Pirosko*, 787 F.3d 358, 369 (6th Cir. 2015)). Whether a statement within an affidavit recklessly disregards the truth is a question of fact. *United States v. Poulsen*, 655 F.3d 492, 504 (6th Cir. 2011) (quoting *United States v. Rice*, 478 F.3d 704, 709 (6th Cir. 2007)). "A factual finding is clearly erroneous when the Court, on reviewing the evidence, 'is left with the definite and firm conviction that a mistake has been committed.'" *Young*, 847 F.3d at 342 (quoting *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999)).

Swanagan's original motion to suppress attacked a January 25, 2022, affidavit rather than the February 7, 2022, affidavit at issue in this appeal. That January 25 affidavit supported a warrant for a wiretap of Lawless' phone. Evidence from that wiretap supported the February 7 affidavit. The parties agree that one of the two statements that Swanagan challenges on appeal appeared in both affidavits but the second appeared only in the February 7 affidavit, so we review the argument regarding the latter for plain error. *See United States v. Deitz*, 577 F.3d 672, 687 (6th Cir. 2009) (noting that plain-error review applied "to new suppression arguments raised for the first time on appeal" (citing *United States v. Lopez-Medina*, 461 F.3d 724, 739 (6th Cir. 2006))). "An error is plain when it is obvious, affects substantial rights, and seriously affects the fairness or integrity of judicial proceedings." *Lopez-Medina*, 461 F.3d at 739 (citing *Johnson v. United States*, 520 U.S. 461, 466–67 (1997)).

The first statement that Swanagan challenges, which we review for abuse of discretion, is Budde's interpretation of "a water emoji symbol to mean methamphetamine . . . ." Swanagan Br. 26. Information in an affidavit is "truthful" if the affiant "believe[s] or appropriately accept[s it] . . . as true." *Franks v. Delaware*, 438 U.S. 154, 165 (1978). The validity of an affidavit is presumed, and the burden lies with the challenger to prove the need for a hearing. *Id.* at 171; *United States v. Abboud*, 438 F.3d 554, 574 (6th Cir. 2006); *see United States v. Fountain*, 643 F. App'x 543, 545 (6th Cir. 2016) ("[The defendant] must 'point to specific false statements that he claims were made intentionally or with reckless disregard for the truth' and 'accompany his allegations with an offer of proof.'" (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990))). That burden is high. *Bennett*, 905 F.2d at 934. The challenger should specify the portions of the warrant he claims are false, state the reasons for that claim, and either provide reliable witness statements or explain their absence. *Id.* (citing *Franks*, 438 U.S. at 171). He must allege more than mistake: He must show "deliberate falsehood or . . . reckless disregard" by the affiant. *Franks*, 438 U.S. at 171. Such a showing of intentional or reckless falsity does not necessitate a hearing if "there remains sufficient content in the warrant affidavit to support a finding of probable cause" once the problematic material in the affidavit is set aside. *Id.* at 171–72.

Swanagan did not make an adequate preliminary showing that Budde's interpretation of the water emoji was intentionally or recklessly false, so the district court did not clearly err in finding the affidavit truthful. Swanagan asserts that he "provided dictionary support that a water emoji had a common meaning of sexual relations" and that "the government acknowledged that the water emoji could have other meanings" besides methamphetamine. Swanagan Br. 26, 29. At most, Swanagan makes out the possibility that the water emoji in his Facebook messages could have an alternative meaning. That possible ambiguity is not the same as reckless or intentional falsity.

The affidavit itself even contains another instance of "water" in a context where the purported sexual connotation would not have made sense. It quotes from a monitored phone call between Lawless and her former methamphetamine supplier Matt Abney, predating the January 25 affidavit, as follows:

BL:   I'm not talking about the money you owed, I'm talking about the rest of it.

MA:   Do what?

BL:   I said, I'm not talking about the money owed, I'm talking about the rest of it the [I/A]

MA:   I know, I know what you're talking about *more water*?

BL:   Yup but I don't know.  I need to get out of it anyways.

Budde Aff., R. 140-1, Page ID #448 (emphasis added).  That use of "water" bolsters Budde's understanding that "water" was code for methamphetamine.  Even if Budde's interpretation was mistaken, Swanagan provides no evidence that such a mistake was intentional or reckless.  He offers no witness statements or evidence suggesting that Budde was aware of a sexual gloss to the symbol.

The second statement that Swanagan alleges was false, which we review for plain error, is Budde's statement that "through his training and experience, [an intercepted conversation between Lawless and Swanagan] was about Ms. Lawless delivering $6,000 in drug proceeds money to Mr. Swanagan's address . . . ."  Swanagan Br. 28.  Swanagan contends that the intercepted conversation with Lawless concerning $6,000 did not pertain to a drug transaction.

Swanagan cites Lawless' trial testimony that the conversation in question was about repayment to Swanagan for a loan he had given Lawless to buy a car.  First, Swanagan did not renew his motion to suppress after Lawless' testimony.  *See United States v. Rogers*, 97 F.4th 1038, 1043 (6th Cir. 2024) ("[The defendant] never renewed his motion to suppress, so the trial record is unavailable in our review." (citing *United States v. Thomas*, 875 F.2d 559, 562 n.2 (6th Cir. 1989))).  Second, even if Lawless' testimony had been available at the time Swanagan moved to suppress the wiretap evidence, the district court could have made the factual finding that Budde's interpretation was truthful.  Accepting Budde's account was not plain error.

Because Swanagan has not made a preliminary showing that the affidavit contained recklessly or intentionally false statements, we do not reach the question of whether probable cause would have existed without the disputed statements.  *See Franks*, 438 U.S. at 171–72; *Young*, 847 F.3d at 348–49 (quoting *Pirosko*, 787 F.3d at 369); *United States v. Colquitt*, 604 F.

App'x 424, 430 (6th Cir. 2015) (first citing *Franks*, 438 U.S. at 171–72; and then citing *United States v. Carney*, 675 F.3d 1007, 1010–11 (6th Cir. 2012)).

### B.  Dirickson's and Fleury's Testimony

Defendants argue that the district court should have excluded trial testimony by Dirickson and Fleury that referenced phone calls intercepted through the wiretap of Swanagan's phone. They argue that the testimony improperly intruded on the province of the jury by interpreting the evidence.   Swanagan nominally frames his argument as constitutional, but the substance is merely that the testimony was inadmissible, so we do not consider the constitutional valence to this issue.  *See United States v. Truett*, No. 24-5162, 2025 WL 637443, at *3 (6th Cir. Feb. 27, 2025) ("It is insufficient 'for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.'"  (quoting *Buetenmiller v. Macomb Cnty. Jail*, 53 F.4th 939, 946 (6th Cir. 2022))).  In his Reply, Reed also raises Simpson's testimony, but we do not address it because we typically decline to entertain arguments not raised in the opening briefs and see no reason to do otherwise.  *See United States v. Moore*, 376 F.3d 570, 576 (6th Cir. 2004) (quoting *Priddy v. Edelman*, 883 F.2d 438, 446 (6th Cir. 1989)).

A law enforcement officer may testify as a lay witness about a given conversation "only when the law enforcement officer is a participant in the conversation, has personal knowledge of the facts being related in the conversation, or observed the conversations as they occurred." *Young*, 847 F.3d at 350 (quoting *United States v. Kilpatrick*, 798 F.3d 365, 379 (6th Cir. 2015)). That standard derives from Federal Rule of Evidence 701, which requires that lay witness opinion be "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701. "The purpose of lay opinion testimony is to 'describ[e] something that the jurors could not otherwise experience for themselves by drawing upon the witness's sensory and experiential observations that were made as a first-hand witness to a particular event.'"  *Young*, 847 F.3d at 350 (alteration in original) (quoting *United States v. Freeman*, 730 F.3d 590, 595 (6th Cir. 2013)).  The proponent of the testimony bears the burden of showing that "the testimony meets

the foundational requirements of Rule 701." *United States v. Williamson*, 656 F. App'x 175, 187 (6th Cir. 2016) (citing *Freeman*, 730 F.3d at 595–96).

Law enforcement testimony causes heightened concern that the witness "(1) could 'effectively smuggle in inadmissible evidence,' (2) may draw the kind of inferences that counsel may draw in closing argument, but with 'the imprimatur of testifying as a law enforcement officer,' (3) could 'usurp the jury's function,' or (4) may be 'doing nothing more than speculating.'" *Kilpatrick*, 798 F.3d at 380 (quoting *Freeman*, 730 F.3d at 596). A detective's knowledge from experience in the field is a double-edged sword. That experience makes the testimony helpful to the jury but also increases the "danger[,]" *id.* at 379, of prejudice.

Some factors that are helpful in reviewing a challenge to law enforcement testimony that interprets "ordinary English," *United States v. Smith*, 609 F. App'x 340, 345 (6th Cir. 2015), from intercepted phone calls are whether the officer testified based on specific personal experience and whether the jury was unequipped to arrive at the same opinions and conclusions. *See id.* at 347 (citing *Freeman*, 730 F.3d at 596–98). Regarding the first factor, direct involvement in an investigation and specifically with the interpreted conversations may be sufficient to establish personal experience. *See id.* at 347. Regarding the second, "a case agent testifying as a lay witness 'may not explain to a jury what inferences to draw from recorded conversations involving ordinary language' because this crosses the line from evidence to argument." *Kilpatrick*, 798 F.3d at 380–81 (quoting *Freeman*, 730 F.3d at 598).

When a party has preserved the issue, we review district court rulings on witness testimony for abuse of discretion. *United States v. White*, 492 F.3d 380, 398 (6th Cir. 2007) (citing *JGR, Inc. v. Thomasville Furniture Indus., Inc.*, 370 F.3d 519, 524 (6th Cir. 2004)). To that end, we "must view the evidence in the light most favorable to the government by maximizing the probative value of the evidence and minimizing . . . [the] *unfair* prejudice caused by admission of the evidence." *Young*, 847 F.3d at 349 (quoting *United States v. Sanders*, 95 F.3d 449, 453 (6th Cir. 1996)). Counsel for both Defendants objected to portions of Dirickson's testimony, preserving the issue with respect to those pieces of testimony.

The district court did not abuse its discretion in admitting the portions of Dirickson's testimony to which Defendants objected. The first bit of testimony at issue is Dirickson's "summar[y]" that Swanagan "was trying to find somebody to go back and get the car before, basically, it was seized." Jury Trial Tr. Vol. 3, R. 405, Page ID #2439. The second is the government's question about Dirickson's "understanding" of a call and "why [it was] important to [her] investigation[.]" *Id.* at Page ID #2443. The third is Dirickson's description that Reed and Swanagan "were again discussing . . . where the car went, who picked it up, discussing, quote, 'shit in the vehicle[.]'" *Id.* at 2451.

The government established a foundation for Dirickson's testimony. Dirickson spoke from her personal perspective and knowledge about the evidence based on her direct involvement with the Swanagan investigation and the wiretap. The statements were not scientific, technical, or specialized. To the extent that Defendants objected to Dirickson's summarizing or translating intercepted calls, the district court directed the prosecution to rephrase its questions, and defense counsel affirmed the court's resolution. The testimony would have been at least somewhat helpful to the jury in understanding from a percipient witness' point of view what the communications signaled to law enforcement. If the recordings were clear enough that the jury could have understood them without comment, then the admissible recordings on their own would have had the same influence as Dirickson's testimony.

Defendants rely on *Freeman*, 730 F.3d 590, but that case is distinguishable. The flaws that were fatal to the admissibility of the Federal Bureau of Investigation agent's testimony in *Freeman* are absent here. First, in *Freeman* the government did not lay a foundation to inform the jury of the source of the agent's knowledge beyond "generic information and references to the investigation as a whole." *Id.* at 596. The agent drew upon 23,000 phone call recordings, of which the jury heard only 77, and his entire 15 years of experience to distill inferences for the jury. *See id.* at 594, 598. In fact, "the government conceded that [he] lacked the first-hand knowledge required to lay a sufficient foundation for his testimony under Rule 701(a)." *Id.* at 597. He had not been "present for the surveillance" or "observ[ed] any activity relevant to interpreting the calls," yet the jury could reasonably assume that "he had some information . . . unknown to them [] that made him better situated to interpret the . . . calls . . . ." *Id.* at 597.

By contrast, the government established a foundation for Dirickson, including her personal familiarity with the Swanagan wiretap and her experience listening to the calls on that wire. Her reactions to the recordings did not give the impression that she was relying on general or institutional knowledge outside of her informed first-hand perceptions of those calls.

Second, the agent's testimony in *Freeman* overlaid the government's theory of the case onto ordinary English in the phone call recordings. For example, the witness explained that the word "situation" referred to the victim's "having stolen jewelry from [defendant's co-conspirator, who] put a hit on [the victim] and [the victim's] ultimately being killed." *Id.* at 598. That testimony narrated the facts the government sought to prove. *See id.* Such "interpretations" were prevalent throughout the agent's testimony. *Id.* at 595. Dirickson, conversely, did not imbue her construction of plain English with the broader inferences and conclusions that the government had the burden to prove. *See Kilpatrick*, 798 F.3d at 381–82. She did not pull extraneous facts into her testimony, draw legal conclusions, tell the jury how to decide the verdict, or engage in baseless speculation. The district court did not abuse its discretion by admitting the testimony to which Defendants objected.

On appeal, Defendants additionally challenge other portions of Dirickson's testimony and Fleury's testimony, to which Defendants did not object at trial. Defendants neither requested nor received a continuing objection to testimony summarizing or translating phone calls. *See United States v. Xu*, 114 F.4th 829, 841 n.4 (6th Cir. 2024). Even though Defendants objected on the same grounds to portions of Dirickson's testimony, the district court did not definitively rule on the issue, but rather "suggested a procedure for the prosecutor to follow to elicit opinion testimony[, so] counsel had an obligation to reiterate the objection in order to preserve it for appeal." *United States v. Nixon*, 694 F.3d 623, 628 (6th Cir. 2012). Notably, counsel approved of the district court's suggested procedure on the record, and the government followed it thereafter.

Swanagan raised the detectives' testimony generally as a basis for his Motion for Judgment of Acquittal or for a New Trial, and now he argues that doing so preserved the issue entirely. But in order to preserve the evidentiary challenge for appeal under Federal Rule of Evidence 103, Defendants had to object timely at trial. *See United States v. Mooney*, 135 F.4th

486, 495 (6th Cir. 2025) (citing *United States v. Wilder*, 87 F.4th 816, 820 (6th Cir. 2023)); *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 313 (6th Cir. 2016); *cf. United States v. Ramer*, 883 F.3d 659, 676 (6th Cir. 2018) (first citing *Lopez-Medina*, 461 F.3d at 746; and then citing *United States v. Olano*, 507 U.S. 725, 731 (1993)) (applying standard to hearsay objection).  The purposes of requiring contemporaneous objections to evidence are to give the district court, which is best acquainted with the facts, a chance to resolve the issue and to prevent a party from strategically withholding objection until an unfavorable outcome occurs.  *See Puckett v. United States*, 556 U.S. 129, 134 (2009); *United States v. Ford*, 761 F.3d 641, 653 (6th Cir. 2014) (quoting *id.*).

Therefore, Defendants did not preserve their challenges to the portions of Dirickson's and Fleury's testimony to which they did not object at trial, and we review those challenges for plain error.  *See United States v. Hall*, 20 F.4th 1085, 1100 (6th Cir. 2022) (citing *Young*, 847 F.3d at 349); Fed. R. Evid. 103(e).  For Defendants to prevail under plain error review, they "must show (1) error (2) that was obvious or clear (3) that affected [their] substantial rights and (4) that affected the fairness[,] integrity, or public reputation of the judicial proceedings."  *Mooney*, 135 F.4th at 495 (citing *Wilder*, 87 F.4th at 820).  "An effect on substantial rights is typically established through a showing of an actual effect on the outcome of the case."  *Lopez-Medina*, 461 F.3d at 745 (citing *United States v. Jones*, 108 F.3d 668, 672 (6th Cir. 1997) (en banc)).

The portions of Dirickson's testimony to which Defendants did not object at trial were not erroneously admitted for the same reasons as the portions to which they did object.  For the most part, Dirickson's other testimony went no further in drawing from general professional knowledge, speculating, or adopting the government's theory of the case in her interpretation of ordinary English.  Many of the calls played for the jury were difficult to parse, and Dirickson helpfully identified the participants and interpreted slang terms, such as "whip" (vehicle) and "deuce" (two ounces).  Trial Tr. Vol. 3, R. 405, Page ID #2437, 2442.  Some of the calls were clearer standing alone than others, but while the helpfulness of Dirickson's testimony about those clearer calls was diminished, so was the threat of prejudice.  Most of the calls reflected that Swanagan was concerned about locating Toliver's vehicle, which she had left at the site of her

arrest, because it contained contents that belonged to him. Dirickson's testimony largely narrated the same.

Only a couple of Dirickson's statements raise the concerns articulated in *Freeman*. The first preceded Defendants' first objection by four transcript pages. The government asked Dirickson to "summarize, based on [her] investigation, . . . what Mr. Swanagan and Mr. Reed were talking about" on a call, and Dirickson replied, in part, "Swanagan was asking Courtland Reed for money, which *we believe* was from distributions of controlled substances." *Id.* at Page ID #2435 (emphasis added). That testimony did encroach on the inferential role of the jury, but that intrusion was mitigated by Dirickson's framing of the response as law enforcement's belief rather than fact. In another instance, the prosecution asked, "[W]ith your knowledge of this investigation . . . —without specifically saying what [the] individuals [on the call] said, what did that call mean to you?" *Id.* at Page ID #2460. Dirickson testified, "That they were discussing controlled substances and the distribution of controlled substances." *Id.* Here again, any importing of the theory that Defendants were involved with the distribution of controlled substances was mitigated by the framing of the question as what the call meant *to Dirickson* and not what it meant on its face. While the jury might have come to the same conclusion based on the recording itself, it contained enough jargon that Dirickson's point of view was helpful. Those portions of testimony may have bordered on objectionable, but, by the same token, they were not admitted in clear or obvious error.

Like Dirickson, Fleury testified based on his own personal knowledge of the investigation and experience monitoring the wiretap, and the government laid that foundation. *See Young*, 847 F.3d at 351. He "did not summarily cite to the broader investigation as his source of information." *Hall*, 20 F.4th at 1102. Some of his testimony was helpful interpretation of "slang and jargon," *id.* (quoting *Young*, 847 F.3d at 351), such as "[z]ip" (ounce) and "action" (crystal methamphetamine), Trial Tr. Vol. 3, R. 405, Page ID #2504, 2506. He also helped to identify who was speaking in the recorded phone calls, clarify muddled audio, and explain how investigators perceived the calls.

But some of Fleury's testimony was potentially problematic. Several of Fleury's responses presumed Defendants' guilt and advanced the government's desired inferences,

even in the absence of jargon or coded language.  In response to the government's questions about multiple recordings that did not mention methamphetamine explicitly or in code, Fleury testified that those calls had informed him about quantities, pricing, and the customer base for crystal methamphetamine.  *See Williamson*, 656 F. App'x at 188 ("[The] testimony crossed the line into impermissible territory. . . . [The witness gave] narrative statements about the content of the conversation and what the conspirators accomplished with it.")

But mitigating factors weaken the argument that any error in admitting Fleury's testimony was obvious or clear, or affected Defendants' substantial rights.  First, the government followed the district court's direction to specify in each instance that it was asking Fleury what the calls meant *to him*.  To some degree, that formulation reduced the risk that the jury might think Fleury was explaining the indisputable meaning of the calls based on superior knowledge.

Second, the belief that the calls were discussing methamphetamine was borne out by other evidence, including the testimony from Toliver and the physical evidence of methamphetamine retrieved from Toliver's vehicle and the 513-1/2 St. Ann Street apartment.

Third, Fleury testified about two calls that explicitly referred to "action," and he defined that codeword as "crystal methamphetamine[,]" anchoring the rest of his references to methamphetamine to the language of the recordings.   Jury Trial Tr. Vol. 3, R. 405, Page ID #2506, 2511.

Fourth, on cross-examination, defense counsel emphasized that the calls had not resulted in investigators' obtaining methamphetamine until Toliver's arrest, that Fleury could not be sure the coded language on the calls referred to methamphetamine, that law enforcement never found Swanagan in "physical, personal possession of crystal methamphetamine," *id.* at Page ID #2523–24, or conducted a controlled buy with Swanagan, and similarly that law enforcement never caught Reed "with any kind of drugs on him[,]" *id.* at Page ID #2528.  *See Williamson*, 656 F. App'x at 188 ("[The defendant] had access to all the[] recorded phone calls, and was free to challenge the accuracy of [the witness]'s interpretation of . . . ambiguous phrases through cross-examination."  (citing *Kilpatrick*, 798 F.3d at 383)).

Finally, the district court instructed the jury that they did not need to accept Dirickson's or Fleury's (among other witnesses') opinions and that, in deciding how much weight to give those opinions, they "should consider the witness's qualifications and how he or she reached their conclusions" and their credibility. Jury Trial Tr. Vol. 4, R. 421, Page ID #2886. That instruction does not cure an error in admitting testimony, but "it diminishes the likelihood that the jury erroneously relied on [Dirickson's or Fleury's] lay opinion testimony in reaching its verdict." *Williamson*, 656 F. App'x at 188–89; *see also Lopez-Medina*, 461 F.3d at 743–44.

Swanagan offers *United States v. Glenn*, 146 F.4th 485 (6th Cir. 2025), as additional authority on this subject. In *Glenn*, the defendant argued "that the district court erred by allowing a law-enforcement officer . . . to testify as an expert about the meaning of common words and phrases contained in text messages . . . ." *Id.* at 487. The majority of the panel agreed and vacated the defendant's conviction. *Id.* at 490, 493. That case is distinguishable. First, the witness at issue in that case was an expert subject to Federal Rule of Evidence 702, rather than a lay witness subject to Rule 701. *Id.* at 490. The Court determined that the subject matter was not appropriate for expert testimony and that the witness was not qualified to give it. *Id.* Second, like in *Freeman*, the witness did not lay a proper foundation. *Id.* at 491. Third, the "testimony involved interpreting ordinary English language to effectively tell the jury the government's theory of the case." *Id.* As this opinion has discussed, those details differ materially from Dirickson's and Fleury's testimony.

Given those considerations, Defendants have not expounded an obvious or clear error that affected their substantial rights. *See United States v. Lake*, No. 23-1454, 2024 WL 4977141, at *5 (6th Cir. Dec. 4, 2024); *Williamson*, 656 F. App'x at 188–89. We do not reach the question of whether the putative error affected the fairness, integrity, or public reputation of the judicial proceedings.

## C.  Shackling During Trial

Reed argues that "[t]he district court plainly erred by failing to hold an evidentiary hearing on the use of physical restraints during trial." Reed Br. 40. As Reed concedes, he did not preserve this issue for appeal, so we review it for plain error. *See United States v. Miller*,

531 F.3d 340, 346 (6th Cir. 2008) (citing *United States v. Fields*, 483 F.3d 313, 356 (5th Cir. 2007)).   Reed's burden is high.   "[T]he plain error doctrine is to be used sparingly, only in exceptional circumstances, and solely to avoid a miscarriage of justice."   *Id.* (quoting *United States v. Phillips*, 516 F.3d 479, 487 (6th Cir. 2008)).   Reed must prove that he was prejudiced by his shackles at trial.   *See id.* at 346–47 (citing *United States v. McCreary-Redd*, 475 F.3d 718, 723 n.5 (6th Cir. 2007)).

*Deck v. Missouri*, 544 U.S. 622 (2005), clearly held that "[t]he law has long forbidden routine use of visible shackles during [trial]; it permits a State to shackle a criminal defendant only in the presence of a special need."   *Id.* at 626.   Such a sight might impair the presumption of innocence afforded to all criminal defendants and violate the constitutional right to a fair trial. *See Estelle v. Williams*, 425 U.S. 501, 503–04 (1976); *United States v. Alsop*, 12 F. App'x 253, 258 (6th Cir. 2001) (per curiam) (citing *id.* at 504); *Deck*, 544 U.S. at 629; *United States v. Perry*, 401 F. App'x 56, 63–64 (6th Cir. 2010).   Jurors should only see a defendant's physical restraints in the courtroom if "justified by an essential state interest[.]"   *Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 842 (6th Cir. 2017) (citing *Deck*, 544 U.S. at 624).   In determining whether such an interest exists, the trial court "should conduct a formal hearing with sworn testimony so it can resolve factual disputes and a meaningful record is preserved for appeal and any potential collateral relief."   *Perry*, 401 F. App'x at 63–64 (citing *Kennedy v. Cardwell*, 487 F.2d 101, 110 (6th Cir. 1973)); *see also Miller*, 531 F.3d at 345 (quoting *Kennedy*, 487 F.2d at 110).

Whether Reed's restraints were actually visible to the jury is a pivotal question.   *Mendoza v. Berghuis*, 544 F.3d 650, 654 (6th Cir. 2008); *see also Porter v. Woods*, No. 18-1009, 2018 WL 6930472, at *1 (6th Cir. June 6, 2018) (first citing *Leonard*, 846 F.3d at 842; then citing *Earhart v. Konteh*, 589 F.3d 337, 349 (6th Cir. 2009); and then citing *Adams v. Bradshaw*, 826 F.3d 306, 317 (6th Cir. 2016)).   Even if jurors observe a defendant in restraints elsewhere (like the courthouse hallway, for example), a defendant is not necessarily prejudiced by his shackles *in the courtroom* if they are not visible there.   *See Mendoza*, 544 F.3d at 654–55.   The record contains no evidence that the jury saw Reed's shackles in the courtroom, other than Reed's post hoc assertion that a juror could have peered down while entering the courtroom and seen the

shackles. While such an assertion could evidence visibility, the district court's own recollection counterbalances it in this instance. The district court noted that it had "engaged in a brief colloquy [not captured on the record] with Reed's counsel ensuring that Reed's shackles were covered by the tablecloth at Defendants' table" and "confirmed with counsel that Defendants' shackles were out of view before the jury was brought in . . . ." Mem. Op. Order, R. 353, Page ID #1860. "Reed's counsel appeared satisfied that they were covered." *Id.* The district court's determination that the shackles had not been visible was not an obvious or clear error.

Furthermore, the district court in this case did not order Reed to be shackled, and Reed did not object to the shackles before or at trial. The lack of compulsion by the court undercuts the relevance of caselaw requiring a hearing. *See Estelle*, 425 U.S. at 512–13 ("[T]he failure to make an objection to the court as to being tried in [prison] clothes . . . is sufficient to negate the presence of compulsion necessary to establish a constitutional violation."). We do not reach a conclusion about whether the district court could have justified ordering Reed to be shackled based on the circumstances of the case. The factors to consider would have included "(1) the defendant's record, his temperament, and the desperateness of his situation; (2) the state of both the courtroom and the courthouse; (3) the defendant's physical condition; and (4) whether there is a less prejudicial but adequate means of providing security." *Lakin v. Stine*, 431 F.3d 959, 964 (6th Cir. 2005) (quoting *United States v. Waagner*, 104 F. App'x 521, 526–27 (6th Cir. 2004)). To properly analyze those factors, the district court would have needed to do more than allude generally to Reed's prior convictions as "a 'clear showing of necessity' . . . 'to prevent the escape of the accused' or 'to protect' those in the courtroom." Mem. Op. Order, R. 353, Page ID #1861 n.2 (first quoting *Kennedy*, 487 F.2d at 111; and then quoting *Woodards v. Cardwell*, 430 F.2d 978, 982 (6th Cir. 1970)). Because Reed did not object, we need not resolve how much more justification would have been required. The district court did not plainly err by not releasing Reed *sua sponte* from his shackles in court.

### D. Juror Encounter in the Courthouse Lobby

Defendants argue that the participation of jurors who saw Defendants in shackles and prison attire in the courthouse lobby violated Defendants' constitutional rights. We review for abuse of discretion the district court's decision not to dismiss a juror who a defendant believes

saw the defendant in shackles. *See United States v. Watts*, No. 21-5302, 2022 WL 706603, at *7 (6th Cir. Mar. 9, 2022) (citing *United States v. Russell*, 595 F.3d 633, 641 (6th Cir. 2010)).

Unlike for visible shackling inside the courtroom, which is inherently prejudicial, a defendant must show actual prejudice to substantiate a claim of having "been observed in shackles for a brief period elsewhere in the courthouse[,]" *United States v. Moreno*, 933 F.2d 362, 368 (6th Cir. 1991) (citing *United States v. Crane*, 499 F.2d 1385, 1389 (6th Cir. 1974)), as a result of "routine security measures[,]" *id.* (quoting *Payne v. Smith,* 667 F.2d 541, 544–45 (6th Cir. 1981)).

The jurors who could have seen Defendants entering the courthouse on the second morning of trial told the district court that any observations during their ingress would not affect their service. No evidence controverts those assurances. The security camera footage is ambiguous. In fact, without the aid of timestamps provided in the appellate briefing, discerning who is in the frame at what time is nearly impossible. Defendants are out of view for most of the video, appearing only partially and only for a few seconds. The district court would have been more familiar with the courthouse layout than this Court and better positioned to contextualize the video's contents. Similarly, nothing besides Defendants' unsubstantiated accusations suggests that the voir dired jurors lied about remaining fair and impartial. The district court was within its discretion in finding those jurors credible. *See United States v. Waldon*, 206 F.3d 597, 608 (6th Cir. 2000); *see also United States v. Poindexter*, 803 F.2d 722, 722 (6th Cir. 1986) (unpublished table decision); *United States v. Doyle*, 720 F. App'x 271, 278–79 (6th Cir. 2018); *Alsop*, 12 F. App'x at 259; *cf. Patton v. Yount*, 467 U.S. 1025, 1036–40 (1984) (deferring to the trial court on the fact question of whether a juror's voir dire assertion of impartiality was credible). Defendants fail in their circular and unsupported argument that the jurors lied about being prejudiced and therefore were prejudiced.

### E. Sufficiency of the Evidence

Defendants argue that that the government's evidence at trial was insufficient to support their convictions. Reed's argument focuses on the lack of evidence that he possessed the methamphetamine found in Toliver's car or that he participated in a conspiracy beyond his "mere

presence" in a single transaction. Swanagan's argument centers the lack of any drugs found on his person or property and the unreliability of certain witness testimony.

We review sufficiency of the evidence claims *de novo*, *United States v. Rosales*, 990 F.3d 989, 994 (6th Cir. 2021) (citing *United States v. Farrad*, 895 F.3d 859, 871 (6th Cir. 2018)); *United States v. Sadler*, 24 F.4th 515, 539 (6th Cir. 2022) (quoting *United States v. Emmons*, 8 F.4th 454, 477 (6th Cir. 2021)), "to determine whether 'any rational trier of fact could find the elements of the crime beyond a reasonable doubt' . . . ." *White*, 492 F.3d at 393 (quoting *United States v. M/G Transp. Servs., Inc.*, 173 F.3d 584, 589 (6th Cir. 1999)). The burden for a defendant claiming insufficiency of the evidence is "very heavy . . . ." *Id.* (quoting *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir. 1986)). The task of the Court of Appeals is not to "reweigh the evidence, re-evaluate the credibility of witnesses, or substitute our judgment for that of the jury[,]" *Hall*, 20 F.4th at 1105–06 (quoting *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009)), as to whether "the evidence at the trial established guilt beyond a reasonable doubt[,]" *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979) (quoting *Woodby v. Immigr. & Naturalization Serv.*, 385 U.S. 276, 282 (1966)). In deference to the jury, we "view[] the evidence in the light most favorable to the prosecution, . . . giving the government the benefit of all inferences that could reasonably be drawn from the testimony[,]" *White*, 492 F.3d at 393 (alterations in original) (quoting *M/G Transp. Servs., Inc.*, 173 F.3d at 589), and resolve "'issues of credibility' . . . in favor of the jury's verdict[,]" *United States v. Collins*, 799 F.3d 554, 589 (6th Cir. 2015) (quoting *United States v. Salgado*, 250 F.3d 438, 446 (6th Cir. 2001)). A conviction may stand on "[c]ircumstantial evidence alone . . . even if it does not remove every possibility besides that of guilt." *Rosales*, 990 F.3d at 994 (citing *United States v. Hendricks*, 950 F.3d 348, 352 (6th Cir. 2020)).

For "conspiracy under 21 U.S.C. § 846, the government must [prove]: (1) an agreement to violate drug laws; (2) knowledge and intent to join the conspiracy; and (3) participation in that conspiracy." *Id.* at 994 (citing *Deitz*, 577 F.3d at 677). A rational juror could have convicted Swanagan of conspiracy based on the trial evidence. Lawless testified that over the course of approximately five weeks she would obtain methamphetamine from Swanagan to distribute to others. Toliver also testified that she was a middleman for Swanagan in methamphetamine

transactions and that Swanagan had directed her about where to bring drugs that belonged to him. Fleury testified about numerous intercepted phone calls in which Swanagan talked with Reed or Stallings about customers, quantities, and prices for what police believed to be methamphetamine. The methamphetamine found in Toliver's car and apartment corroborated those suspicions.

The evidence is not as prevalent in Reed's case, but a rational juror still could have found Reed guilty of conspiracy. The phone call recordings and related testimony apply to Reed as they apply to Swanagan. Reed is correct that some calls are ambiguous, but ambiguity does not foreclose rational inferences based on the evidence as a whole. Reed specifically argues that the phone calls from February 18, 2022, demonstrate his involvement with distribution of Percocet rather than methamphetamine, but the government's development of that evidence at trial suggests that the deal on that date may have involved an exchange of methamphetamine for pills.

Toliver's testimony indicated that Toliver was "middlemanning" meth between Swanagan and Reed on February 22, 2022. Jury Trial Tr. Vol. 2, R. 404, Page ID #2340. Toliver additionally testified that Swanagan referred to Reed as his "partner" when Swanagan instructed her to pick up Reed, collect his money, and give him methamphetamine on February 22, 2022. Trial Tr. Vol. 3, R. 405, Page ID #2390. The quantity of that methamphetamine turned out to be over 600 grams, which Simpson testified would be an amount associated with an upper-level dealer and much more than someone would possess for personal use. Defendants attack Toliver's credibility, pointing out that she struggled to remember certain details from the time period of the traffic stop and admitted to lying to law enforcement. Credibility assessments are squarely within the province of the jury, and we are ill equipped to second guess them based on a cold transcript. *See United States v. Underwood*, 129 F.4th 912, 939 (6th Cir. 2025) (citing *United States v. Wright*, 16 F.3d 1429, 1440 (6th Cir. 1994)).

Reed contends that evidence related to the transaction on February 22, 2022, is insufficient to convict him of conspiracy because that was a single buyer-seller transaction. Although such a transaction is "not probative of an agreement to join together to accomplish a [broader] criminal objective[,]" *Rosales*, 990 F.3d at 994–95 (quoting *United States v. Hamm*, 952 F.3d 728, 736 (6th Cir. 2020)), "the buyer-seller exception is 'narrow[,]'" *United States v.*

*Simpson*, 138 F.4th 438, 448 (6th Cir. 2025) (quoting *United States v. Wheat*, 988 F.3d 299, 308 (6th Cir. 2021)).  "It can be overcome with evidence of an implicit agreement to distribute drugs to at least one other person."  *Id.* (citing *Wheat*, 988 F.3d at 308).  Several factors assist in determining whether a buyer-seller "transaction is part of a larger conspiracy . . . ."  *Rosales*, 990 F.3d at 995.  Those factors include "(1) the length of the relationship; (2) the established method of payment; (3) the extent to which transactions are standardized; and (4) the level of mutual trust between the buyer and the seller."  *Id.* (quoting *Deitz*, 577 F.3d at 681); *see also Sadler*, 24 F.4th at 539.  The defendant need not "be an active participant in every phase of the conspiracy, so long as he is a party to the general conspiratorial agreement[,]" "was aware of the object of the conspiracy[,] and . . . voluntarily associated himself with it to further its objectives."  *Hall*, 20 F.4th at 1106 (quoting *United States v. Gibbs*, 182 F.3d 408, 421 (6th Cir. 1999)).

Some of those factors weigh against finding Reed to be a conspirator.  The government did not show that Reed and Swanagan had been operating together for long.  Investigators became aware of Reed in early 2022.  Reed paid Toliver in cash the day of the traffic stop.  The government's civilian witnesses generally did not know Reed or knew him as a friend of Swanagan.

Other factors, though, tip in favor of the government and suggest that Reed intended to distribute the methamphetamine found in Toliver's car to others.  The phone call recordings adduce a degree of standardization and mutual trust between Reed and Swanagan.  On those calls, Defendants use codewords about which Simpson testified, such as "zip" (ounce) and "action" (methamphetamine).  Jury Trial Tr. Vol. 3, R. 405, Page ID #2555.  They talk about pricing.  In multiple calls, Swanagan instructs Reed about where to go to complete drop-offs or pick-ups, and Reed assures Swanagan that he will take care of those tasks.  Ultimately, we cannot say that a rational juror lacked sufficient evidence to convict either Defendant of conspiracy.

To prove a defendant guilty of drug possession under 21 U.S.C. § 841(a)(1), the government must prove beyond a reasonable doubt "that the defendant:  '(1) knowingly, (2) possessed a controlled substance, (3) with intent to distribute it.'"  *Sadler*, 24 F.4th at 550

(quoting *Russell*, 595 F.3d at 645); *see also Hall*, 20 F.4th at 1106 (quoting *United States v. King*, 339 F. App'x 604, 608 (6th Cir. 2009)).   Possession may be actual or constructive. *Russell*, 595 F.3d at 645 (citing *United States v. Welch*, 97 F.3d 142, 150 (6th Cir. 1996)); *see also Sadler*, 24 F.4th at 550 (quoting *Welch*, 97 F.3d at 150).   Constructive possession figures where the defendant enjoys "'ownership, dominion, or control over the contraband itself or the premises or vehicle in which the contraband is concealed.'   Physical proximity to drugs, or mere presence in an area where drugs are found, is not sufficient."   *Russell*, 595 F.3d at 645 (quoting *United States v. White*, 932 F.2d 588, 589 (6th Cir. 1991) (per curiam)).   A person constructively possesses something when he "knowingly has the power and the intention . . . to exercise dominion and control over" it, directly or indirectly.   *United States v. Fairley*, 137 F.4th 503, 512 (6th Cir. 2025), *cert. denied*, 2025 WL 2824046 (U.S. Oct. 6, 2025) (No. 24-7448) (mem.); *see also United States v. Critton*, 43 F.3d 1089, 1096 (6th Cir. 1995) (citing *id.*).

A rational juror could have concluded that Swanagan constructively possessed methamphetamine based on the same evidence discussed in the context of conspiracy.   The intercepted phone calls and civilian testimony plausibly could have convinced a juror that Swanagan owned, and dominated and controlled the movement of, methamphetamine and intended to exercise that control by directing Lawless, Toliver, and Reed.   That evidence also demonstrated Swanagan's intent to distribute.   Furthermore, police found over 200 grams of methamphetamine—an amount Simpson testified a dealer might carry—at the apartment Swanagan provided for Toliver.

For Reed, again, the case is not as strong but certainly adequate.   Reed never touched or saw the methamphetamine in Toliver's car on February 22, 2022.   The drugs were inside Toliver's car, within a pink bag that Toliver claimed was her own and that contained Toliver's driver's license.   After Reed gave Toliver his money and got into her car, Toliver told him that she would "give the meth to him whenever [she] dropped him off at the hotel."   Jury Trial Tr. Vol. 3, R. 405, Page ID #2395.   On the one hand, maybe Reed had not taken possession of the methamphetamine yet.   The evidence does not suggest that he had the authority to reach into Toliver's bag and retrieve the drugs for himself.   He may not have even known they were in the pink bag.

On the other hand, possession of the drugs may have transferred to Reed, or he and Toliver may have shared joint possession, after he paid Toliver. Phone call recordings, text messages, and testimony reflect coordination among Reed, Toliver, and Swanagan to transfer the contraband to Reed. Swanagan directed Reed to give $2,900 to the person who picked him up. Swanagan told Toliver to pick someone up, take that person's money, and give that person methamphetamine. When Toliver arrived at the pickup location, Reed got into her car and handed her a stack of money. Police recovered approximately $2,800 and methamphetamine from Toliver's car, in which Reed had been riding. In briefing and at oral argument, Reed's counsel made much of Toliver's contention that, at the time of the traffic stop, she had not counted the money that Reed had given her. That factor is at most just one of several considerations for the jury. Viewing the evidence in the light most favorable to the prosecution, Toliver's claim that she had not yet counted Reed's money or physically handed the drugs to Reed when the police stopped her vehicle would not categorically preclude a rational juror from finding constructive possession.

Reed relies on *United States v. Quintanar*, 150 F.3d 902 (8th Cir. 1998), which is a decades-old, out-of-circuit case and distinguishable from the facts at hand. In *Quintanar*, a package of drugs arrived at the home of a non-party, addressed to her former boyfriend. *Id.* at 903. The recipient had not expected a package and was unaware of its contents or purpose. *Id.* at 903–04. The defendant seemed to have been acquainted with the former boyfriend, knew the contents of the package, and sought to take possession of it. *Id.* Any intended transaction involving the defendant was more attenuated and fell apart earlier in the sequence of events than the one involving Reed. The Court of Appeals did not describe any evidence that the package was intended for the defendant or that he paid anyone in exchange for it. Neither his name nor his address was on the box. *Id.* at 904. He was never in close physical proximity to the package, like in a car, and never directed its movement. *Id.* As soon as the recipient learned that the package contained drugs, she turned it over to the police. *Id.* Meanwhile, Swanagan intended the methamphetamine in Toliver's car to go to Reed, Toliver brought the methamphetamine along its intended path and accepted Reed's money, and Reed instructed Toliver where to bring him and the drugs, together, before the police appeared. *Quintanar* is not persuasive under these circumstances.

Beyond the evidence related to the February 22, 2022, transaction, the phone call recordings that support a finding of constructive possession as to Swanagan are circumstantial evidence of possession as to Reed.  If Reed was delivering methamphetamine at Swanagan's direction, he would have been carrying the product.

As for the element of intent, once possession is resolved, phone call recordings between Reed and Swanagan evidence an intent to distribute.  Additionally, the quantity and purity of the intercepted drugs, the presence of $2,800 in cash, and the absence of personal use tools or paraphernalia in Toliver's vehicle could be evidence of intent to distribute to others.  *See Hall*, 20 F.4th at 1107 (citing *United States v. Phibbs*, 999 F.2d 1053, 1065–66 (6th Cir. 1993)); *United States v. Clark*, No. 21-1316, 2022 WL 2231062, at *2 (6th Cir. June 21, 2022) (per curiam) (citing *United States v. Hill*, 142 F.3d 305, 311–12 (6th Cir. 1998)); *United States v. Montgomery*, 491 F. App'x 683, 689 (6th Cir. 2012) (quoting *United States v. Burton*, 440 F. App'x 474, 477 (6th Cir. 2011)); *United States v. Cathey*, 485 F. App'x 119, 125 (6th Cir. 2012) (citing *United States v. Wettstain*, 618 F.3d 577, 585 (6th Cir. 2010)); *United States v. Collier*, 246 F. App'x 321, 329–30 (6th Cir. 2007) (citing *United States v. Faymore*, 736 F.2d 328, 333 (6th Cir. 1984)).  A rational juror could have concluded beyond a reasonable doubt that Reed intended to distribute methamphetamine that was in his possession.

### F.  Swanagan's Prior Kentucky Drug Trafficking Conviction

Swanagan's prior controlled substance convictions factored into two components of his sentence:  the U.S.S.G. Chapter Four career offender designation and the 21 U.S.C. §§ 841 and 851 statutory minimum enhancement.  Swanagan challenges both components on the basis that the Kentucky definitions of controlled substances did not match the relevant federal definitions under U.S.S.G. § 4B1.2(b) and the Controlled Substances Act ("CSA").  We review *de novo* the issue of whether the district court properly relied on a predicate prior conviction to classify a defendant as a career offender under the sentencing guidelines.  *United States v. Jones*, 81 F.4th 591, 597 (6th Cir. 2023).  We also review *de novo* the issue of whether a prior conviction qualifies a defendant for sentence enhancement under 21 U.S.C. § 841(b)(1)(A).  *United States v. Pritchett*, 749 F.3d 417, 423 (6th Cir. 2014) (quoting *United States v. Corona*, 493 F. App'x 645, 653 (6th Cir. 2012)).

Chapter Four of the 2023 sentencing guidelines, under which Swanagan was sentenced, provided that a defendant may be a career offender based on two prior felony convictions that are either "crimes of violence" or "controlled substance offenses." U.S.S.G. § 4B1.1. That chapter defined "controlled substance offense," in relevant part, as "an offense under federal *or state law* . . . that[] prohibits . . . distribution [or possession with intent to distribute] . . . of a *controlled substance* . . . ." U.S.S.G. § 4B1.2(b) (emphasis added). In *United States v. Jones*, we held that "state-law controlled substance offenses need not define controlled substances according to the Controlled Substances Act to count under § 4B1.2(b)." 81 F.4th at 598. We are bound by that precedent. *See United States v. Moody*, 206 F.3d 609, 615 (6th Cir. 2000) ("[We] may not overrule the decision of another panel[,]" which "is binding authority[,] unless a decision of the United States Supreme Court mandates modification or this Court sitting en banc overrules the prior decision." (citing *Salmi v. Sec'y of Health & Hum. Servs.*, 774 F.2d 685, 689 (6th Cir. 1985))); *see also United States v. Cogdill*, 130 F.4th 523, 527 (6th Cir. 2025). Swanagan recognizes that the benefit of arguing this issue on appeal is to preserve it for en banc or United States Supreme Court review.

*Jones* does not, however, resolve Swanagan's §§ 841 and 851 argument. The district court sentenced Swanagan on May 23, 2024, relying on his 2009 Kentucky Controlled Substance Trafficking conviction as the sole predicate for the §§ 841 and 851 enhancement. We examine the versions of the federal sentencing statutes in effect in May 2024 and the version of the Kentucky Controlled Substance statute in effect in March 2009. Under 21 U.S.C. § 841(b)(1)(A)(viii), Swanagan was subject to a minimum sentence of 15 years due to his prior conviction for a "serious drug felony." The applicable definition of "serious drug felony" came from 18 U.S.C. § 924(e)(2), *see* 21 U.S.C. § 802(57), and included, in relevant part, "an offense under State law, involving . . . a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)) . . . ." 18 U.S.C. § 924(e)(2)(A)(ii). The CSA, in turn, defined "controlled substance" by inclusion on any of several schedules. 21 U.S.C. § 802(6). Cocaine and its various related materials, compounds, mixtures, preparations, derivatives, salts, and isomers appeared on Schedule II. *Id.* § 812 Schedule II(a)(4).

Swanagan stipulated that he was convicted in Daviess County, Kentucky, on March 6, 2009, of trafficking cocaine.  The March 2009 Kentucky First Degree Controlled Substance Trafficking statute criminalized trafficking of narcotic drugs listed on state schedules.  Ky. Rev. Stat. Ann. § 218A.1412.  Based on Kentucky's 2009 Schedule II and definition of "narcotic drug," that Trafficking statute encompassed the same substances related to cocaine as the contemporaneous federal Schedule II.  *Id.* § 218A.070; *id.* § 218A.010(23); 21 U.S.C. § 812 Schedule II(a).  Swanagan could not have been guilty of First Degree Controlled Substance Trafficking in Kentucky for trafficking cocaine without trafficking a "controlled substance" as defined by the CSA.  Swanagan's argument against relying on the 2009 drug trafficking conviction as a predicate for the §§ 841 and 851 15-year minimum fails.

### G.  Swanagan's Leadership Role Enhancement

Swanagan argues that his sentence is procedurally unreasonable because the district court erroneously applied a leadership role enhancement under U.S.S.G. § 3B1.1(a).  He contends that the government did not meet its burden in showing that five or more people were involved in a conspiracy.  We review a sentence's reasonableness for abuse of discretion, *United States v. Minter*, 80 F.4th 753, 757 (6th Cir. 2023) (quoting *United States v. Seymour*, 592 F. App'x 482, 482 (6th Cir. 2015) (per curiam)), *cert. denied*, 144 S. Ct. 1078 (2024), the district court's factual findings behind a § 3B1.1 enhancement for clear error, *United States v. Sexton*, 894 F.3d 787, 794 (6th Cir. 2018), and the conclusion that a person is an organizer or leader under Section 3B1.1 deferentially, *Minter*, 80 F.4th at 758 (first citing *United States v. Washington*, 715 F.3d 975, 983 (6th Cir. 2013); and then citing *United States v. Warren*, No. 22-3323, 2023 WL 1961222, at *3 (6th Cir. Feb. 13, 2023)).  *See also United States v. Robinson*, 813 F.3d 251, 262 (6th Cir. 2016) (quoting *Washington*, 715 F.3d at 982–83).  We affirm factual findings under clear-error review if they are plausible based on the record.  *United States v. Taylor*, 85 F.4th 386, 388 (6th Cir. 2023); *see Sexton*, 894 F.3d at 794 ("[W]e abide by the court's findings of fact unless the record leaves us with the definite and firm conviction that a mistake has been committed." (quoting *United States v. House*, 872 F.3d 748, 751 (6th Cir. 2017)).

Under the 2023 guidelines, a defendant's offense level could increase by four "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants

or was otherwise extensive . . . ." U.S.S.G. § 3B1.1(a). "The government bears the burden of proving that the enhancement applies by a preponderance of the evidence." *Sexton*, 894 F.3d at 795 (quoting *United States v. Vandeberg*, 201 F.3d 805, 811 (6th Cir. 2000)). Generally, we have held that when a district court applies "the enhancement under U.S.S.G. § 3B1.1, the district court must make specific findings as to the identity of the persons involved in the criminal enterprise." *United States v. Stubbs*, 11 F.3d 632, 641 (6th Cir. 1993). That requirement slackens, however, when the same judge presides over the trial and sentencing proceedings in a conspiracy case. *United States v. Elder*, 90 F.3d 1110, 1132 (6th Cir. 1996) ("[I]n *Stubbs,* the defendant had not been charged with conspiracy . . . . [W]here a trial judge also presides over the sentencing, it is not improper for him not to make specific references about why he classifies a defendant as a leader or organizer.").

At Swanagan's sentencing hearing, the district court incorporated the findings in the presentence report and identified five participants who were involved in the conspiracy: Swanagan, Lawless, Reed, a female in the Southern District of Indiana, and an unindicted male involved in the movement of narcotics from Kentucky. It also noted that Swanagan was "being held as the source of supply for multiple individuals . . . ." Swanagan Sentencing Tr., R. 450, Page ID #3359. The district court thus made sufficient findings as to the identity of the participants, particularly since this was a conspiracy case with the same district judge presiding over the trial and sentencing.

But even if the district court's factual findings as to the identity of the five participants at the sentencing hearing had been insufficient, we have held that "the failure to specify the factual basis for applying a § 3B1.1 enhancement" does not necessitate remand, where factual support is apparent in the record. *Vandeberg*, 201 F.3d at 809 (quoting *United States v. Alexander*, 59 F.3d 36, 39 (6th Cir. 1995)); *see id.* at 810–11. "Although reciting the names would have established a clearer record, the court was under no obligation to do so since it expressly adopted the government's list of participants, and the record supports the court's findings." *House*, 872 F.3d at 751–52 (citing *United States v. Thomas*, 373 F. App'x 538, 541 (6th Cir. 2010)).

In this case, the record supports the district court's determination that at least five participants were involved in the conspiracy. Aside from Swanagan himself, Lawless testified

that Swanagan provided methamphetamine to her to distribute to others. Toliver testified that Swanagan would give her methamphetamine and that she would "middleman" at his direction regarding "where to take things and where to pick things up . . . ." Jury Trial Tr. Vol. 2, R. 404, Page ID #2312. The jury found Reed guilty of involvement in the conspiracy. And intercepted phone calls introduced as evidence implicate Stallings as Swanagan's supplier. The district court's factual finding thus was not clearly erroneous, and we are satisfied that there was a sufficient basis in the record for the district court to apply the leadership role enhancement under U.S.S.G. § 3B1.1(a) to Swanagan's sentence.

## H.  Variance to Methamphetamine Mixture Range

Swanagan challenges the substantive reasonableness of his sentence on the ground that the district court refused to vary his guidelines range to that advised for mixed, as opposed to pure, methamphetamine offenses. We review substantive reasonableness challenges for abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007); *United States v. Kamper*, 748 F.3d 728, 739 (6th Cir. 2014) (citing *United States v. Brooks*, 628 F.3d 791, 795 (6th Cir. 2011)). We "should not overturn a sentence just because [we] 'might reasonably have concluded that a different sentence was appropriate.'" *Brooks*, 628 F.3d at 796 (quoting *Gall*, 552 U.S. at 51). A sentence is substantively unreasonable if it is "greater than necessary," *Holguin-Hernandez v. United States*, 589 U.S. 169, 174–75 (2020), weighs any § 3553(a) factor too much or too little, *United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018), relies on impermissible factors, ignores pertinent factors, or is otherwise arbitrary, *Pirosko*, 787 F.3d at 372. "Sentences within a defendant's Guidelines range are presumptively substantively reasonable . . . ." *Id.* at 374; *see also United States v. Gates*, 48 F.4th 463, 477 (6th Cir. 2022).

The United States Supreme Court has held that district courts may use discretion to determine that a guidelines range is "greater than necessary" because of a policy stance against "the disparity between the Guidelines' treatment of crack and powder cocaine offenses." *Kimbrough v. United States*, 552 U.S. 85, 91 (2007). We have "clarified that district judges may exercise their discretion to reject Guidelines ratios because of policy disagreements in 'all aspects of the Guidelines.'" *Kamper*, 748 F.3d at 741 (quoting *United States v. Cole*, 343 F. App'x 109, 115 (6th Cir. 2009)).

Courts have rejected the mixture to actual methamphetamine ratio for various reasons, including the lack of empirical support, the lack of correlation between drug purity and culpability, and disparities compared to other drug offenses. *United States v. Johnson*, 812 F. App'x 329, 334 (6th Cir. 2020) (first quoting *United States v. Bean*, 371 F. Supp. 3d 46, 51 (D.N.H. 2019); and then citing *United States v. Nawanna*, 321 F. Supp. 3d 943, 955 (N.D. Iowa 2018)). Notwithstanding those rationales, district courts are not required to vary from the guidelines. *Kamper*, 748 F.3d at 742; *Johnson*, 812 F. App'x at 334.

As Swanagan's sentence falls at the bottom of the guidelines range, and Swanagan has not shown that the range was improperly calculated, the sentence is presumptively reasonable. *See United States v. Allen*, 93 F.4th 350, 359 (6th Cir. 2024). What's more, Swanagan's current sentence would have received the presumption of reasonableness even if the district court had used the lower range. The probation office held Swanagan responsible for 823 grams of actual (pure) methamphetamine. Under the 2023 guidelines, the base offense level for a § 841 conviction for 500 grams to 1.5 kilograms of actual methamphetamine was 34. U.S.S.G. § 2D1.1(c)(3). The base offense level for the same weight of a mixture containing a detectable amount of methamphetamine was four points lower at 30. *Id.* § 2D1.1(c)(5). Swanagan's total offense level after adjustments was 40. If that total offense level had decreased by four from 40 to 36, the guidelines range, given Swanagan's criminal history category of VI, would have decreased from 360 months to life to 324 to 405 months. *Id.* § 5A (Sentencing Table). Swanagan's 360-month prison sentence would still fall within that reduced range. In fact, at sentencing, Swanagan's counsel conceded that varying to the mixture guideline might not "make that much of a difference on the ultimate sentence . . . ." Swanagan Sentencing Tr., R. 450, Page ID #3381.

Regardless of the merits of Swanagan's policy disagreement, it does not overcome the presumption of reasonableness, *see Allen*, 93 F.4th at 359–60, and Swanagan has provided no other rebuttal. Therefore, Swanagan has not shown that the district court abused its discretion by imposing a substantively unreasonable sentence. *See United States v. Confer*, No. 24-3589, 2025 WL 2933088, at *4 (6th Cir. Oct. 15, 2025).

**I. Reed's First Degree Burglary Enhancement**

Reed's sentence was predicated in part on the stipulation that Reed had been convicted of Burglary in the First Degree in Daviess County, Kentucky, in January 2011.  The district court categorized that prior conviction as a "serious violent felony" to enhance Reed's sentence under 21 U.S.C §§ 841 and 851.  Reed argues that the conviction did not qualify as a "serious violent felony."  The government agrees.

Whether Reed's First Degree Burglary offense qualified as a predicate for purposes of §§ 841 and 851 is a question of law that we review *de novo*.  *Pritchett*, 749 F.3d at 423 (quoting *Corona*, 493 F. App'x at 653).  Even though the government concedes the point, our own analysis is appropriate.  *Cf. United States v. Butts*, 40 F.4th 766, 769 (6th Cir. 2022) ("'We are not bound to accept . . . what in effect was a stipulation on a question of law[,]' [and i]n interpreting statutory language, we cannot delegate our authority to the parties . . . ." (quoting *United States v. Wilson*, 978 F.3d 990, 996 (6th Cir. 2020))); *Orloff v. Willoughby*, 345 U.S. 83, 87 (1953) ("This Court, of course, is not bound to accept the Government's concession that the courts below erred on a question of law."); *accord United States v. Jones*, 667 F.3d 477, 486 (4th Cir. 2012); *United States v. Gray*, 905 F.3d 1145, 1148 (9th Cir. 2018) (per curiam).  We agree with the parties that remanding for resentencing is necessary.

Section 841(b)(1)(A)(viii) of Title 21 of the U.S. Code, under which the district court determined Reed's statutory minimum sentence, provides that a person who violates § 841(a) in a manner involving 50 grams or more of methamphetamine faces a mandatory minimum term of imprisonment of 10 years.  21 U.S.C. § 841(b)(1)(A).[1]  A person who commits such a violation after two or more "serious violent felony" convictions faces a minimum term of imprisonment of 25 years.  *Id.*  The relevant definition of "serious violent felony" comes from 18 U.S.C. § 3559, *see* 21 U.S.C. § 802(59), and entails:

> (i) a Federal or State offense, by whatever designation and wherever committed, consisting of murder; manslaughter other than involuntary manslaughter; assault with intent to commit murder; assault with intent to commit rape; aggravated

---

[1]The district court sentenced Reed in February 2024.  Any amendments to the relevant federal statutes since that date are immaterial in this case, so we refer to the current versions.

> sexual abuse and sexual abuse; abusive sexual contact; kidnapping; aircraft piracy; robbery; carjacking; extortion; arson; firearms use; firearms possession; or attempt, conspiracy, or solicitation to commit any of the above offenses; and
>
> (ii) any other offense punishable by a maximum term of imprisonment of 10 years or more that has as an element the use, attempted use, or threatened use of physical force against the person of another or that, by its nature, involves a substantial risk that physical force against the person of another may be used in the course of committing the offense . . . .

18 U.S.C. § 3559(c)(2)(F) (internal parentheticals omitted). Under that definition, an offense may qualify as a "serious violent felony" in three ways: (1) if it is enumerated in subsection (i) (the "enumerated offenses clause"); (2) if an element of the offense entails "the use, attempted use, or threatened use of physical force against the person of another" (the "elements clause"); or (3) if it "involves a substantial risk that physical force against the person of another may be used" (the "residual clause"). *Id.*

The district court did not indicate which clause applied to Reed, and the choice is not otherwise obvious. Burglary does not appear in the enumerated offenses clause. The elements for First Degree Burglary in Kentucky do not satisfy the elements clause, and the residual clause is unconstitutional. Therefore, we see no reason to reject the parties' consensus.

*United States v. Burris*, 912 F.3d 386 (6th Cir. 2019) (en banc), announced the categorical approach to assessing whether a statute falls under the elements clauses of both the Armed Career Criminal Act's ("ACCA") definition of "violent felony" and the guidelines' definition of "crime of violence." *Id.* at 392–93. "The question for the sentencing court in the elements-clause context is whether every defendant convicted of that state or federal felony *must have* used, attempted to use, or threatened to use physical force against the person of another *in order to have been convicted* . . . ." *Id.* at 392. The *Burris* analysis transfers naturally to 18 U.S.C. § 3559(c)(2)(F), as the language of its elements clause is identical to the language at issue in *Burris*. *Cf. United States v. Ivy*, 93 F.4th 937, 942 (6th Cir. 2024) ("We can apply our interpretation . . . because those clauses 'are identical.'" (quoting *Burris*, 912 F.3d at 392)).

Under *Burris*, we consider whether a statute defining a criminal offense is broader than the sentencing definition in question and whether the offense statute is divisible, meaning that it

contains multiple alternative sets of elements distinguishing multiple crimes. *See Burris*, 912 F.3d at 393. If any but not all of a divisible statute's alternative sets of elements categorically satisfies the elements clause, the sentencing court applies the modified categorical approach. That approach involves consulting a limited set of documents from the prior record (typically the indictment, jury instructions, plea agreement, or plea colloquy) to identify the set of elements relevant to the defendant's conviction. *Id.* (first quoting *Descamps v. United States*, 570 U.S. 254, 257 (2013); and then quoting *Mathis v. United States*, 579 U.S. 500, 505, 136 S. Ct. 2243, 2249 (2016)).

The 2011 Kentucky statute prohibiting Burglary in the First Degree (which was amended in 2022, but in no relevant way) was overbroad compared to § 3559(c)(2)(F). It stated, in relevant part:

> (1) A person is guilty of burglary in the first degree when, with the intent to commit a crime, he knowingly enters or remains unlawfully in a building, and when in effecting entry or while in the building *or in the immediate flight therefrom*, he or another participant in the crime:
>
>> (a) *Is armed with explosives or a deadly weapon*; or
>>
>> (b) Causes physical injury to any person who is not a participant in the crime; or
>>
>> (c) Uses or threatens the use of a dangerous instrument against any person who is not a participant in the crime.

Ky. Rev. Stat. Ann. § 511.020 (emphasis added). That statute encompassed conduct other than offenses that have "as an element the use, attempted use, or threatened use of physical force against the person of another . . . ." 18 U.S.C. § 3559(c)(2)(F)(ii).

As an illustration of that point, consider Reed's representation that the building he burglarized was an unoccupied gun shop. The facts underlying Reed's prior conviction do not figure into the categorical analysis at hand, *see Burris*, 912 F.3d at 392, but that fact in particular helps to understand the reach of the Kentucky statute. One can fathom a scenario in which someone burglarizes a gun shop to steal weapons and therefore is armed with a deadly weapon in the flight from the building, without using, attempting to use, or threatening to use physical force against anyone.

We need not rely on our imagination for that theory. *See id.* at 398 ("The Supreme Court has cautioned us . . . not to 'apply legal imagination to the state offense; there must be a realistic probability, not a theoretical possibility, that the State would apply its statute to conduct that falls outside' the conduct described in the elements clauses." (first quoting *Moncrieffe v. Holder*, 569 U.S. 184, 191 (2013); and then citing *United States v. Southers*, 866 F.3d 364, 368 (6th Cir. 2017))); *United States v. Cervenak*, 135 F.4th 311, 327 (6th Cir. 2025) (en banc) ("We . . . look[] to the statutory text to determine the statutory elements, and then . . . to caselaw to assess 'the full range of conduct encompassed by those statutory elements.'" (quoting *Cradler v. United States*, 891 F.3d 659, 667–70 (6th Cir. 2018))).   Kentucky has historically applied its First Degree Burglary statute to such conduct. *See, e.g.*, *Hayes v. Commonwealth*, 698 S.W.2d 827, 829–30 (Ky. 1985) (acknowledging that "one who enters a dwelling unarmed and steals guns becomes 'armed' with a deadly weapon within the meaning of KRS 511.020" even without proof that the weapon was "ready for use" (first quoting *Daugherty v. Commonwealth*, 572 S.W.2d 861, 863 (1978); and then citing *Jackson v. Commonwealth*, 670 S.W.2d 828, 830 (Ky. 1984), *abrogated on other grounds by Cooley v. Commonwealth*, 821 S.W.2d 90 (Ky. 1991))); *McGorman v. Commonwealth*, No. 2001-SC-0783-MR, 2003 WL 21258361, at *3 (Ky. May 22, 2003) (mem.) (applying *Hayes* where defendant argued there was no proof "that the weapon stolen was in working order"); *Sparkman v. Commonwealth*, No. 2022-SC-0474-MR, 2024 WL 647237, at *2 (Ky. Feb. 15, 2024) (mem.) (quoting *Wilson v. Commonwealth*, 438 S.W.3d 345, 354 (Ky. 2014)).   We are bound by the Kentucky Supreme Court's interpretation of its criminal law. *See Burris*, 912 F.3d at 398 (citing *Southers*, 866 F.3d at 368).

The Kentucky statute was also divisible.  In *Mathis v. United States*, the Supreme Court "described several ways to determine whether a state statute is divisible . . . ." *Burris*, 912 F.3d at 402. *Mathis* stated that courts should consider whether a state court has definitively held that the statute in question is divisible, whether the statute resolves the issue on its face, and whether the "statutory alternatives carry different punishments . . . ." *Mathis*, 579 U.S. at 517–18.  If those considerations cannot resolve the divisibility question, courts may "peek" at the record to determine whether the alternatives in the statute are elements or means. *Id.* at 518.

We have identified no case that definitively states that the Kentucky First Degree Burglary statute is divisible.  The text of the statute, though, suggests that it is.  On its face, the disjunctive formulation indicates that a person may be convicted if and only if one of the three subsections, (a) through (c), is satisfied.  All three subsections draw the same punishment, though, as Class B felonies.  Ky. Rev. Stat. Ann. §§ 511.020, 532.060.  A "peek" at the record from Reed's First Degree Burglary conviction helps.  Reed's indictment for First Degree Burglary states:

> Courtland T. Reed . . . committed the offense of Burglary in the First Degree when, with the intent to commit a crime, . . . [he] knowingly entered or remained unlawfully in a dwelling, . . . *and when effecting entry or while in the building, or in the immediate flight therefrom he was armed with a deadly weapon*.

Indictment, Case No. 09-CR-496 (Ky. 6th Cir. Oct. 5, 2009) (emphasis added).  The specification of Reed's conduct corresponding to subsection (a) of the First Degree Burglary statute is a clue that the statute was and is divisible.  *See Cervenak*, 135 F.4th at 323 (noting that the indictment showed which subsection of the robbery statute applied to the defendant); *United States v. Ritchey*, 840 F.3d 310, 318 (6th Cir. 2016) ("[T]he record could indicate that the statute contains a list of distinct elements 'by referencing one alternative term to the exclusion of all others.'"  (quoting *Mathis*, 579 U.S. at 519, 136 S. Ct. at 2257)).  If the statute is divisible, the next step is to determine which part of the divisible statute pertained to Reed's conviction.  Our examination of the Kentucky indictment has already addressed that step.  *See Burris*, 912 F.3d at 407.  The indictment charged Reed under the "armed with explosives or a deadly weapon" subsection, which does not satisfy the elements clause.

The residual clause does not work either.  The U.S. Supreme Court has held that nearly identical language in other statutes is unconstitutionally vague.  In *Johnson v. United States*, 576 U.S. 591 (2015), the Supreme Court struck down the portion of the ACCA defining "violent felony" as "any felony that '*involves conduct that presents a serious potential risk of physical injury to another*.'"  *Id.* at 593–94, 597 (emphasis added) (quoting 18 U.S.C. § 924(e)(2)(B)).  Because of "the indeterminacy of the wide-ranging inquiry required" to conjure "the kind of conduct that the crime involves in 'the ordinary case,' and to judge whether that abstraction presents a serious potential risk of physical injury[,]" the clause "denies due process of law."  *Id.*

at 596–97 (quoting *James v. United States*, 550 U.S. 192, 208 (2007), *overruled by*, *Johnson*, 576 U.S. 591). The Court referred to two features of the clause that made it unconstitutional: (1) "grave uncertainty about how to estimate the risk posed by a crime" and (2) "uncertainty about how much risk it takes for a crime to qualify as a violent felony." *Id.* at 597–98. The Court also recognized "persistent" attempts and failures to establish a standard in preceding cases. *Id.* at 598 (quoting *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 91 (1921)).

In *Sessions v. Dimaya*, 584 U.S. 148 (2018), the Supreme Court applied *Johnson* and decided that the residual clause of the Immigration and Nationality Act's definition of "crime of violence" was unconstitutionally vague. *Id.* at 152–53. The residual clause of the definition encompassed "any [] offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." *Id.* at 153 (quoting 18 U.S.C. § 16(b)). Recall that the residual clause of § 3559(c)(2)(F) extends to a felony "that, by its nature, involves a substantial risk that physical force against the person of another may be used in the course of committing the offense . . . ." 18 U.S.C. § 3559(c)(2)(F). The language is nearly identical. The *Dimaya* clause suffered from the same two defects identified in *Johnson*. *Dimaya*, 584 U.S. at 160–62, 174–75.

In *United States v. Davis*, 588 U.S. 445 (2019), the Supreme Court struck down the residual clause of 18 U.S.C. § 924(c), *id.* at 448, 470, which statute enhances sentences for defendants who use firearms in committing "crime[s] of violence." 18 U.S.C. §924(c)(1)(A). The residual clause of that statute defines "crimes of violence" as felonies "that by [their] nature, involve[] a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." *Id.* §924(c)(3)(B). Again, that language is barely distinguishable from 18 U.S.C. § 3559(c)(2)(F). The Supreme Court found that the § 924(c)(3)(B) residual clause "provides no reliable way to determine which offenses qualify as crimes of violence and thus is unconstitutionally vague." *Davis*, 588 U.S. at 448. The Court reiterated the lesson of *Johnson* and *Dimaya*: "[T]he imposition of criminal punishment can't be made to depend on a judge's estimation of the degree of risk posed by a crime's imagined 'ordinary case.'" *Id.* at 453.

Logically, *Johnson*, *Dimaya*, and *Davis* dictate the unconstitutionality of § 3559(c)(2)(F)'s residual clause. Its phrasing is materially similar to the residual clauses in those precedents, and it is subject to the categorical approach like those clauses were. Other jurists have already alluded to the potential unconstitutionality of the provision. *See Gatewood v. United States*, 979 F.3d 391, 394 (6th Cir. 2020); *United States v. Harrison*, 54 F.4th 884, 891 (6th Cir. 2022) (Cole, J., concurring); *see also United States v. Bell*, No. 22-5111, 2023 WL 2583384, at *4 (10th Cir. Mar. 21, 2023); *Walker v. United States*, No. 17-14701, 2021 WL 3754596, at *6 (11th Cir. Aug. 25, 2021) (per curiam); *United States v. Morrison*, 751 F. App'x 1026, 1027 (9th Cir. 2019) (mem.).

The basis for the district court's classification of Reed's First Degree Burglary conviction as a "serious violent felony" is uncertain. We are confident in the parties' consensus that the classification was incorrect. The government has not argued that the error was harmless, *see Butts*, 40 F.4th at 774, and we do not suspect that it was, considering that the district court sentenced Reed to what it thought was the statutory minimum. Therefore, we vacate Reed's sentence and remand for resentencing.

### III.  CONCLUSION

Defendants have not shown that their convictions for possession with intent to distribute methamphetamine and conspiracy to possess with intent to distribute methamphetamine should be reversed because the evidence was insufficient or because they were prejudiced by any abuse of discretion in evidentiary or trial management matters. Swanagan has failed to show that the district court abused its discretion in imposing his sentence. We are persuaded, however, that the parties are correct that the district court should not have incorporated Reed's prior First Degree Burglary conviction as a "serious violent felony." Therefore, we **AFFIRM** Defendants' convictions, **AFFIRM** Swanagan's sentence, and **VACATE** Reed's Sentence and **REMAND** the case to the district court for resentencing consistent with this opinion.